UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA                                   :
                                                           :
            v.                                             :   11 Cr. 429 (WHP)
                                                           :
ANTHONY J. SCOLARO, JR.,                                   :
                                                           :
            Defendant,                                     :
                                                           :
-----------------------------------------------------------X

# DEFENDANT'S SENTENCING MEMORANDUM

William M. Brodsky, Esq.
Fox Horan & Camerini LLP
Attorneys for Defendant
*Anthony J. Scolaro, Jr.*
825 Third Avenue
New York, NY 10022
Tel. (212) 480-4800

## Introduction

We respectfully submit this memorandum to articulate for the Court why we believe that a probationary, non-incarcerative sentence is appropriate for Anthony Scolaro. We submit that when the Court considers all the facts and circumstances of this case, including both the Probation Department's report and recommendation and the government's letter motion under § 5K1.1 of the Sentencing Guidelines, and weighs all the factors mandated by 18 U.S.C. § 3553 (a), Your Honor will find that a term of probation is the right sentence for Mr. Scolaro.

This is so, we submit, for at least four reasons. First, this was the *only* time in his professional life in the securities business that he *ever* traded on information that he knew was from an illegal source. *See* Gov't 5K1.1 letter, at 2 ("There is no evidence that Scolaro knowingly traded on inside information in other securities.") Indeed, the Probation Department termed it "an isolated aberrant act." P.S.R. p.21.

Second, Mr. Scolaro cooperated with the prosecutors and agents and provided them with "substantial assistance."

Third, Mr. Scolaro, but for this isolated lapse of judgment, is the kind of man we all would be proud to have our children grow up to be. As the many letters in the Addendum to this memorandum attest, Mr. Scolaro is a trustworthy, honest, decent person of integrity.

Fourth, the Probation Department believes that incarceration is not appropriate for Mr. Scolaro and recommends probation.

Mr. Scolaro is a devoted family man sustained by his abiding religious faith. He regularly attends the Noroton Presbyterian Church where he recently was appointed a Deacon. His wife has for some time been an Elder. He and his family have participated in mission trips and Bible studies, and they are stalwarts of the congregation. Mr. Scolaro also volunteers his services to World Vision, a charity that distributes supplies to needy children and families in the South Bronx. Under the auspices of World Vision, he and his older son traveled to West Virginia and worked to install a roof for a less fortunate family. Mr. Scolaro has also volunteered at the Open Door Homeless Shelter in South Norwalk and with Feed My Starving Children, which prepares and sends packaged meals to medical clinics and orphanages throughout the world.

### Initial Contact With Law Enforcement

Monday, November 2, 2009, was a momentous day for Anthony Scolaro. That evening, as he was walking to his car after work, he was accosted by two FBI agents. They identified themselves and, in words and substance, informed him they had recorded evidence that he had engaged in trading with illegal inside information. They went so far as to play a portion of that evidence for him. They advised Mr. Scolaro that, based on the facts they had learned, he was not someone who should go to prison. They offered him the opportunity to cooperate instead of being arrested. The agents left a card and suggested that Mr. Scolaro get an attorney.

Mr. Scolaro took the agents' advice and consulted his local attorney in Connecticut, who recommended our firm. Mr. Scolaro came to our office the very next afternoon, Tuesday, November 3rd. Afterwards, I contacted Reed Brodsky, Esq. (no relation), the Assistant United States Attorney assigned to the case. Mr. Brodsky agreed

to permit me to listen to the evidence against Mr. Scolaro, which I did the next day. Mr. Brodsky played portions of recordings of Mr. Scolaro talking with Franz Tudor, a trader with whom Mr. Scolaro had been friendly and often spoke. After consultations with counsel, Mr. Scolaro and his wife, Brenda, decided he would cooperate with the government. They hoped that his assistance would be deemed "substantial" and, with the concurrence of the Court, result in his not being incarcerated.

## Mr. Scolaro's Cooperation

Thus began an 18-month odyssey during which Mr. Scolaro followed the directions of the agents and prosecutors. He made 43 telephone calls on a special phone line that enabled the FBI to record the conversations. In addition, Mr. Scolaro had meetings over dinner, lunch and drinks with persons of interest to the agents, all of which were recorded. Mr. Scolaro also met with the agents on at least ten occasions. These meetings were held in order to develop strategies for Mr. Scolaro's undercover activities and to prepare him for the face-to-face secretly recorded meetings.

All of this was in addition to the proffer sessions that Mr. Scolaro had with prosecutors and agents at the outset of his cooperation. These two anxiety-filled grillings took place on November 6 and 11, 2009, and lasted 4 to 5 hours each. After the first meeting, the A.U.S.A. asked Mr. Scolaro to agree to record telephone calls and meetings and to perform whatever undercover activities the agents requested. Mr. Scolaro agreed to perform such covert activities without any assurance that he would be accepted as a formal cooperator. In fact, it wasn't until November 12, 2010 – a full year later – that the prosecutors proffered such a written agreement to Mr. Scolaro, which he signed on November 19, 2010.

Throughout the entire period of his cooperation, Mr. Scolaro was prohibited from telling anyone except his wife about his situation. He could not explain why he had been fired from his job on November 10, 2009.[1] Mr. Scolaro found it excruciating to keep this secret from his two sons then aged 12 and 10 and his 83 year old father. They would continually ask, "Why aren't you working at Diamondback anymore?" and "What made you decide to stay at home and manage your own investments?" He could not disclose his status until his plea was unsealed by your Honor on May 18, 2011.

### The Offense

Franz Tudor had been a healthcare portfolio manager, an analyst and a head of research covering the healthcare industry, and a proprietary trader with a number of funds and broker/dealers. Mr. Scolaro had met him at a conference in about 2002/2003, and the two specialists in healthcare stocks became friendly. They talked frequently about companies in which to invest or from which to divest, as well as about family and other personal matters. Their exchanges were based on information that was available to the public or to analysts. Rumors were exchanged as well. Never, to Mr.

---

[1] On November 5, 2009, the FBI arrested nine people, including two attorneys – one of whom, Arthur Cutillo, then with the firm of Ropes & Gray, was charged with, among other things, purloining and leaking confidential inside information that Axcan Pharma, Inc. was soon to be taken over by a hedge fund client of his law firm. Axcan was a company that Mr. Scolaro had invested in on behalf of funds advised by his employer, Diamondback Advisors CT, LLC ("Diamondback"). Mr. Scolaro was immersed in a proffer session on the next day (Friday, November 6th) and was not present at his office. Diamondback personnel were seeking to interview him concerning his trades, and they kept calling his cell phone during the meeting. At the conclusion of the session, it was agreed that I would notify Diamondback's in-house counsel that I would not permit Mr. Scolaro to be interviewed. He never returned to work, and he was formally terminated four days later.

5

Scolaro's knowledge, did they disclose to each other information that came from a source who owed the issuer the duty of confidentiality.

This changed in late October of 2007. In a telephone conversation, Mr. Tudor asked Mr. Scolaro whether he had "looked at" Axcan Pharma's stock recently. Mr. Scolaro replied that he had not, but had owned the stock in Diamondback's funds in the past and would take a look at the company to see if the stock appeared to be cheap. Mr. Tudor then said that he had spoken to the head of investor relations at Axcan and had discussed the strong cash flow of the company in the face of strong competition from generics. Mr. Tudor asked the Axcan official to describe the company's long-term strategic options. The official replied that the company was always open to alternatives that would "unlock strategic value." Mr. Tudor then told Mr. Scolaro that he had heard that Axcan was going to be taken over by private equity.

As a result of this conversation with Mr. Tudor, Mr. Scolaro did look at the publicly available information about the company and decided that its fundamentals were sound and the stock was underpriced. Shortly thereafter, he bought approximately 50,000 to 75,000 shares in the company for Diamondback investment funds. In the following days or weeks the stock rose in price, but then began to decline. Mr. Scolaro called Mr. Tudor to see if he knew why the stock was going down. In this conversation, as if to reassure Mr. Scolaro and to establish his bona fides, Mr. Tudor told Mr. Scolaro in words or substance that, "my lawyer says a takeover bid is going to happen, but things take time." This is the first and only time that Mr. Tudor indicated in any way that his information came from someone who had a fiduciary duty to the company.

After the takeover bid was announced, Mr. Scolaro sold the stock, resulting in a gain. Never before in his entire professional career as a portfolio manager had Mr. Scolaro knowingly traded on inside information. This was the first and *only* time that he did so. To put this in context, Mr. Scolaro has bought and sold millions of shares in thousands of companies over his 27-year career in the securities industry. For that one lapse in judgment, Mr. Scolaro has paid dearly. He has been convicted of two felonies, has lost his job and will never work in the securities industry again.[2]

### Anthony Scolaro, the Man

Who is Anthony Scolaro? The portrait that emerges from the Presentence Report and the letters from those who know him well (*See* Addendum) is that of a caring, religious, moral, honest, trustworthy and decent man. He is a loving husband and father. He and his wife, Brenda, have been married for 22 years. They have two sons, 15 and 13. Mr. Scolaro cares about his fellow man and, more importantly, he doesn't just do so from the comfort of his home, but he puts his beliefs into action by volunteering to help the underprivileged.

---

[2] In addition to his criminal prosecution, Mr. Scolaro has settled a civil suit (11-cv-6112) and an administrative debarment proceeding, both brought by the SEC. Mr. Scolaro agreed to be barred from being associated with any company whose stock is publicly traded and with any broker/dealer or investment advisory firm. In the civil suit, the SEC collected $962,486 in disgorgement from Diamondback. As to Mr. Scolaro, however, the SEC determined that his gain from the illegal trading in Axcan was $125,890. Mr. Scolaro agreed to pay that amount in disgorgement plus an additional $14,420 in pre-judgment interest, for a total of $140,310. In addition, the SEC demanded that Mr. Scolaro pay a penalty of $62,945, which he has already done. The settlement further provides that Mr. Scolaro may defer payment of the disgorgement and interest until after his sentencing. Mr. Scolaro will receive a dollar-for-dollar credit against the disgorgement and interest for any amount he is ordered to pay in forfeitures.

Mr. Scolaro has taken full responsibility for his actions, and he has demonstrated his deep and sincere remorse, not only to the prosecutors and investigators, but also to his family, friends, colleagues and fellow worshipers. A man who can publicly say, "I have pleaded guilty to a securities law felony," and still have people write the admirable, indeed laudatory, letters in the Addendum, is a very special human being. Not a man, we respectfully submit, who should be sent to prison. Mr. Scolaro's one transgression is truly an aberration in an otherwise law abiding and moral life.

### Fine

The Probation Department has recommended that Mr. Scolaro be fined $250,000. We respectfully disagree. The SEC has determined that Mr. Scolaro's gain from his crime was $125,890. He must pay that amount plus $14,420 in interest to the SEC as disgorgement of his ill-gotten gains or to the United States as a forfeiture. In addition, Mr. Scolaro has in effect been fined by the SEC, which required him to pay a penalty of $62,945. We note that none of the other defendants sentenced to probation were fined such a significant amount as the Probation Department recommends here. *See* P.S.R. pp. 4-5. Indeed, Franz Tudor, who received three years' probation, was fined only $20,000. We respectfully submit that, if the Court deems a fine to be appropriate in addition to Mr. Scolaro's forfeiture, disgorgement and penalty, it should be in an amount commensurate with that imposed on Mr. Tudor.

### Restitution

We submit that no restitution should be ordered in this case. The SEC has collected $1 million from Diamondback and will collect $140,510 from Mr. Scolaro. The

counterparties to the illegal trades, the "victims' of the crime, are impractical to identify and likely too numerous. There has been no compliance with Fed. R. Crim. Pro. 32(c)(1)(B) and 18 U.S.C. § 3664, a prerequisite to entry of a restitution order. *United States v. Reifler,* 446 F.3d 65, 121-122 (2d Cir. 2006). Moreover, determining how much each counterparty would be entitled to would certainly "complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A (c)(3). Under such circumstances, the Court is not required to order restitution, *In Re Huff Asset Mgt, Co., LLC et al. (United States v. Rigas),* 409 F 3d 555, 563-4, (2d Cir. 2005).

## Conclusion

For the foregoing reasons, we respectfully submit that Mr. Scolaro should be sentenced to a term of probation and not incarcerated. We note that Mr. Scolaro has, in effect, been on probation since November 6, 2009, a period approaching three years. Accordingly, we submit that, since the normal term of probation for a felony is five years, Mr. Scolaro should be sentenced to two years' probation with no fine.

Dated: New York, New York
       July 26, 2012

Respectfully submitted,

*[signature]*

William M. Brodsky, Esq.
Fox Horan & Camerini LLP
Attorneys for Defendant
*Anthony J. Scolaro, Jr.*
825 Third Avenue
New York, New York 10022
Tel. (212) 480-4800